IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT

2008 SEP 16 PM 4: 28

CLERK _____
SO. DIST. OF GA.

UNITED STATES OF AMERICA    )
                              )
          v.                )        CR 108-053
                              )
RAMON AGUIRRE            )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the Government has accused Defendant Ramon Aguirre of four (4) counts of income tax evasion. (Doc. no. 1). The indictment alleges that Defendant fraudulently concealed over $525,719 in income between calendar years 2001 and 2004. (Id.). The matter is now before the Court on Defendant's motion to suppress evidence and corrected motion to suppress evidence. (Doc. nos. 22, 23). The Government opposes the motions. (Doc. nos. 26, 27). On July 1, 2008, the Court conducted an evidentiary hearing on the matter, and heard testimony from Special Agent Stephanie A. Huebner (*hereinafter* "SA Huebner"), Internal Revenue Service ("IRS"), Criminal Investigation. Following the hearing, the parties filed supplemental briefs in support of their respective positions. (Doc. nos. 34, 35).

By way of general background, Defendant argues in his motion to suppress that on August 19, 2005, IRS agents executed a search warrant at 3107 Old McDuffie Road, Augusta, Georgia; the warrant was directed at the New Era Tax Service (*hereinafter*

"NETS") located on the premises of 3107 Old McDuffie Road. Defendant contends that the agents were fully aware prior to the execution of the warrant that Rabel General Services (*hereinafter* "RGS"), a general automotive repair company owned by Defendant was located at 3109 Old McDuffie Road and that Defendant occupied an RGS office on the premises at 3107 Old McDuffie Road. (Doc. no. 23, p. 2). Defendant further argues that his office was "separate" from NETS and that the search warrant affiant, SA Huebner with the IRS, failed to inform the Court of his separate office in the affidavit.[1] (Id.). Defendant seeks not only suppression of evidence gathered during the execution of the search warrant, but he also seeks suppression of statements he made on August 19, 2005, November 3, 2005, March 14, 2007, and April 10, 2007. (Doc. no. 23, Exs. C, E, F & G).

For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that the motions to suppress evidence be **DENIED**.[2]

## I.   FACTS

### A.   SA Huebner's Affidavit

On August 18, 2005, SA Huebner submitted her 23-page affidavit seeking a search warrant for the "offices and storage areas of [NETS], formerly known as J.R. CRUZ TAX

---

[1]Defendant also maintains that after his arrival at his office on the morning of the contested search, he unambiguously informed the agents that his office had no connection with NETS other than containing a file cabinet wherein "NETS kept overnight checks for security reasons . . . ." (Doc. no. 23, p. 4).

[2]Although Defendant technically filed two motions to suppress, the second motion was filed "*solely* to clarify or correct a portion of the Introduction and Background section of his original Motion to Suppress Evidence at pages 2 and 3. *No* changes are made to the argument set forth in the Motion." (Doc. no. 23, p. 1 n.1). Therefore, for ease of reference, the Court will refer to one motion to suppress throughout the remainder of this Report and Recommendation.

SERVICE, 3107 Old McDuffie Road, Augusta, Georgia 30906, and being more particularly described in Attachment 'A' . . . ." (Doc. no. 23, Ex. A, Huebner Aff., p. 1). Attachment A describes NETS as being located in a small, residential style one-story building sharing the lot with another building, RGS.

Based on her investigation, SA Huebner believed NETS to be owned by Jose Cruzastol (*hereinafter* "Cruzastol") and that on the NETS premises would be located evidence and/or instrumentalities of criminal offenses against the United States related to tax fraud. (Id. at 3, ¶ 1). SA Huebner related that Cruzastol applied to participate in the IRS E-File program in 1994 as the principal and owner of J.R. Cruz Tax Service (*hereinafter* "JRCTS") and subsequently obtained an electronic filing number. (Id. at 5, ¶ 2). The affidavit related SA Huebner's belief that Cruzastol was, as a paid tax return preparer, actually in the business of preparing tax returns grossly exaggerating or completely fabricating business expenses and charitable contributions.[3] (Id. at 6, ¶¶ 5-6). Additionally, the affidavit linked Defendant to the scheme by reporting information received from a former JRCTS client, Garvin Harris (*hereinafter* "Harris").[4] (Id., ¶ 6). This concrete eye witness information shed light on the mechanics of the scheme and its participants.[5]

---

[3]SA Huebner also pointed out that JRCTS and NETS submitted tax returns, 97% of which generated refunds averaging $2,424 per return. (Doc. no. 23, Ex. A, Huebner Aff., p. 6, ¶ 5).

[4]On March 14, 2003, after reporting information concerning illegal activities at JRCTS, Harris met with IRS agents. Harris stated that Defendant, an employee of JRCTS, had prepared his (Harris's) 2002 federal and state income tax returns and that Defendant had included fraudulent vehicle expenses and charitable contributions. (Id., ¶ 6).

[5]Officials received additional information about the scheme when, in 2004, a three-year client of JRCTS stated that her tax return had been audited by the State of South

SA Huebner also stated that on January 23, 2004, IRS Revenue Officer ("RO") Stephen Harding conducted an E-File monitoring visit at JRCTS and audited randomly drawn client files for due diligence purposes.[6] (Id. at 7, ¶ 7). Cruzastol identified himself as the sole proprietor of JRCTS and Beatrice Degro (hereinafter "Degro") as one of his employees. (Id.). RO Harding compared the random sample with the corresponding client questionnaires and tax returns; the information on some of the questionnaires did not match the returns. (Id.). In addition, RO Harding found that the returns contained false information. (Id. at 7-8, ¶ 7). On March 4, 2004, RO Harding returned to JRCTS to discuss his findings with Cruzastol and explain that he was recommending suspension of Cruzastol's participation in the E-File program based on the irregularities he had discovered during his audit; Defendant was present during the meeting.[7] (Id., ¶ 8).

SA Huebner's affidavit related, however, that suspension of Cruzastol's E-File number and his participation in the program did not bring Cruzastol's violations to an end.

_____

Carolina and that she had been assessed $13,000 in additional tax due and owing. (Id. at 8-9, ¶ 10). She related that Cruzastol had prepared her returns and had fabricated employee business and charitable contributions without either hers or her husband's consent. (Id. at 9, ¶ 10). When she confronted Cruzastol, he gave her a check for $1,500 to assist her with the assessment. (Id.).

[6]Under 26 U.S.C. § 6107 and 26 C.F.R. § 1-6107, a person who prepares income tax returns must retain specific records concerning completed returns or claims for refunds, and these materials must be retained and kept available for inspection for a 3-year period following the close of the return period during which the return or claim for refund was presented for the taxpayer to sign.

[7]Defendant's presence at this meeting and participation in the preparation of Harris's tax returns connect Defendant to the business affairs of JRCTS and NETS, show that he, too, was a preparer of fraudulent tax returns, and suggest that evidence of those violations would be found in his workspace at 3107 Old McDuffie Road, Augusta, Georgia.

JRCTS was under surveillance during January and February of 2005 and was observed to be conducting "business as usual." Cruzastol continued to prepare and file returns at the same location, now under the business name New Era Tax Service. SA Huebner learned that Cruzastol's employee, Degro, claiming ownership, had applied for and been granted an IRS Electronic Filing Number for NETS at 3107 Old McDuffie Road, Augusta, Georgia, and that Cruzastol was preparing and filing tax returns with the new E-File number.[8] (Id. at 9-10, ¶¶ 11, 13).

The affidavit also related that in 2005, the IRS initiated an undercover investigation of NETS, sending an undercover agent (*hereinafter* "UCA") pretending to need assistance with his 2004 tax year return. The UCA provided information about himself that should have resulted in the payment of $250 in additional taxes, but Cruzastol informed the UCA that he would receive a refund. (Id. at 12, ¶ 18). Cruzastol prepared and filed a false tax return for the UCA, admitting to the UCA that he padded the UCA's deductions on the return. (Id. at 12- 13, ¶ 18). While the UCA was inside JRCTS, he observed Degro sitting in front of a computer, entering an unidentified name and social security numbers into a computer containing software entitled "TaxSlayer." (Id., ¶ 19). He also observed client files strewn about Cruzastol's office. (Id.).

SA Huebner's affidavit then drew the reasonable conclusion that Cruzastol was significantly under-reporting his actual income to the IRS. She reported that the gross receipts reflected on the tax returns filed for both JRCTS and NETS for the tax years 2001

---

[8]Returns filed for the tax year 2004 continued to reflect abnormally high refund percentages averaging $1,997 per return. (Doc. no. 23, Ex. A, Huebner Aff., p. 10, ¶ 14).

through 2004 totaled $49,272. Applying the most conservative estimate of the fees charged by JRCTS and NETS for preparing returns, i.e., the $75 charged to the UCA, the two businesses would have grossed $579,750 for the four taxable years and therefore under-reported their income by $530,478. (Id. at 14, ¶ 21).

It is clear from the affidavit that the IRS knew and certainly had probable cause to believe that Cruzastol was the sole proprietor of JRCTS while he was authorized to participate in the IRS E-File program and held an E-File Number. Based on the start up of NETS by one of Cruzastol's former employees, Degro, based on the fact that NETS started up at the exact location where JRCTS had been located, and based on the fact that Cruzastol continued to prepare and file fraudulent tax returns at NETS, there was sufficient evidence to conclude that he continued to own and operate NETS.

**B.    SA Huebner's Testimony**

SA Huebner also testified at the evidentiary hearing as the case agent in the above-captioned case related to, *inter alia*, the preparation of fraudulent income tax returns by Cruzastol and NETS (and its former incarnation as JRCTS), and Defendant's charges of income tax evasion.

SA Huebner testified that she and the other search and interview team members arrived at the NETS offices at approximately eight o'clock on the morning of August 19, 2005. She stated that the offices were unoccupied and that a locksmith was used to open the front door. She added that the door to Defendant's office was unlocked when the agents arrived and there was no sign on Defendant's office door alerting them that a separate business was run from there. She testified that after the rooms were videotaped, the search

6

began. She stated there was a photograph of a car on the door of Defendant's office but denied seeing the words "Rabel General Services" on the door.

According to SA Huebner, Defendant did not arrive at the search location until approximately 8:45 a.m. According to the agreed upon search protocol, upon his arrival, agents advised Defendant of his non-custodial rights. SA Huebner stated that Defendant never inquired whether he was under investigation, and no agents informed him he was under investigation. After the advice of rights, Defendant agreed to speak to the agents. A copy of the search warrant was shown to Defendant, and according to SA Huebner, he informed the agents that RGS was not covered in the search warrant.[9] Thus, he asserted that the agents should not be in his office. Defendant added that there were no NETS-related documents in his office.

Apparently concerned about Defendant's assertion of a privacy interest in his office, SA Huebner inquired of the searching agents whether any documents related to NETS were discovered in Defendant's work space. She also inquired as to whether there was a RGS sign on the door to Defendant's office. She was told that, indeed, the agents had located and seized numerous documents related to NETS, and there was no RGS sign on the door. It is also obvious that SA Huebner was somewhat perplexed by Defendant's assertion of a privacy

---

[9]When asked whether it was improper to seize RGS records when RGS was not named in the search warrant, SA Huebner correctly noted that the examination of RGS's 2003 return showed that RGS was a tax return preparation client of JRCTS and NETS and that the search warrant authorized the seizure of client business records. (See doc. no. 23, Ex. A, Attach. B, Items to Be Seized, ¶¶ 1A-E).

interest in a RGS office. SA Huebner had seen a copy of the RGS 2003 tax return[10] and noted that Cruzastol had not only prepared the return but also represented himself to be either the president or CEO of RGS. In any event, SA Huebner ordered the agents to continue the search.

SA Huebner also testified concerning the voluntariness of statements made by Defendant on August 19, 2005 and thereafter. She stated that, prior to any interaction with a taxpayer, IRS agents advise the taxpayer of his or her non-custodial rights, even when culpability has not been determined, as a precautionary measure. She stated that on August 19, 2005, each IRS interview team advised its respective interviewees of their non-custodial rights, regardless of their status in the criminal investigation. She added that on that date, Defendant had not been designated the "target" of a criminal investigation.[11] She also stated that their investigation and research had revealed Cruzastol to be the owner and operator of JRCTS, NETS, and RGS, and that there could be an innocent explanation for Defendant's association with these businesses. Of course, Defendant's status in the investigation changed on August 19, 2005.

At some point during his conversation with the interviewing agents, Defendant admitted that he was the owner of all the property at 3107 Old McDuffie Road. For some

_____

[10]Although the record does not contain a copy of RGS's 2003 corporate tax return, when shown a copy of that document on November 3, 2005, Defendant indicated that the gross receipts listed on that document were a combination of both the tax preparation business and RGS. (Doc. no. 23, Ex. E, ¶ 17).

[11]SA Huebner explained that the IRS follows a specific procedure, including the completion of an IRS 4930 Form, when designating the target of a criminal investigation. SA Huebner testified that prior to August 19, 2005, this procedure had not been initiated with respect to Defendant.

inexplicable reason, Defendant also admitted that RGS was actually owned by his son. Nevertheless, Defendant claimed that he controlled the business and its accounts, and that he did not want the business or the income to be in his name "because of his disability payments." (Doc. no. 23, Ex. C, ¶¶ 10-11).

Subsequent to the events of August 19, 2005, Defendant indeed became a "target" of an IRS investigation as a result of his admissions regarding unreported income. SA Huebner explained that the IRS then summonsed, based on information previously provided by Defendant and Cruzastol, Defendant's bank records. In this regard, SA Huebner testified that, prior to August 19, 2005, the IRS already possessed Defendant's interest-bearing account information recorded in his IRS Form 1099 filings. After the August 19, 2005 search, IRS agents discussed the above-captioned criminal case with Defendant on November 3, 2005,[12] March 14, 2007, and April 10, 2007.[13] (Doc. no. 23, Exs. E, F & G). Finally, SA Huebner testified that nothing seized on August 19, 2005 was relied upon or utilized in the investigation concerning the above-captioned case.

## C.    Defendant's Version of Events

### 1.    Interviews with IRS Agents

During his August 19, 2005 interview, Defendant informed IRS agents that he purchased the property where RGS was located in 1998. The adjacent house where NETS

---

[12]Notably, on November 3, 2005, SA Huebner advised Defendant that he "was *now* under criminal investigation for failure to file income tax returns and for unreported income" and reminded him that he was "not under criminal investigation during his previous interview . . . ." (Doc. no. 23, Ex. E, p. 1 (emphasis added)).

[13]As discussed in detail below, Defendant has also moved to suppress the results of the four interviews he voluntarily submitted to during and after the August 19, 2005 search.

and Defendant's alleged RGS office was located was already on the property when he purchased it. (Doc. no. 23, Ex. C, ¶ 10). During his November 3, 2005 interview, Defendant told the agents that RGS was started out of his home at 2303 Gaskill Road, Augusta, Georgia, and that he moved the business to its current location in 1999. (Id., Ex. E, ¶ 14). He stated that he incorporated RGS in Puerto Rico in 2000 using his son's name, Juan Aguirre. (Id., ¶ 15). During his August 19, 2005 interview, he told agents that his son was the "owner" of the business and its accounts. He explained that due to his 100% disability rating, he did not want the business, nor the income generated by it, in his name. (Doc. no. 23, Ex. C, ¶¶ 10-11).

Adding further confusion concerning ownership of RGS, Defendant also told agents the RGS stockholders consisted of his sister (then deceased), Cruzastol, and his ex-wife. (Id., ¶ 11). However, during his November 3, 2005 interview, he muddied the waters even further when he stated that the only shareholders in RGS were himself and Cruzastol, the RGS Chief Executive Officer, and that they were "fifty-fifty owners." (Doc. no. 23, Ex. E, ¶ 16).

### 2. Affidavit in Support of Motion to Suppress

Pursuant to Local Criminal Rule 12.1 and for the purpose of establishing his expectation of privacy in his office at 3107 Old McDuffie Road, Defendant submitted a signed affidavit in support of his motion to suppress.[14] (Doc. no. 23, Ex. B, Def.'s Aff.). In

---

[14]Although Defendant requests in his motion to suppress that any statements made following the allegedly improper search be suppressed (doc. no. 23, pp.1, 6-7), his affidavit makes no mention of any statements (other than to say that he told agents that there was an RGS business office within 3107 Old McDuffie Road), let alone any statements having been

general, Defendant's affidavit maintains that the "RGS business office was used for RGS business and had no substantial connection to New Era Tax Service." (Id., ¶ 8). It additionally argues that Defendant "had an expectation of privacy within the RGS business office...." (Id., ¶ 9). Specifically, Defendant contends that on August 19, 2005, he was the sole proprietor and owner of RGS, an automotive repair shop located at 3109 Old McDuffie Road, Augusta, Georgia. He states that RGS and NETS, a tax preparation business, occupied one-room and two-room offices, respectively, within the building located at 3107 Old McDuffie Road. (Id., ¶¶ 3-6). Defendant states that his office generally remained locked and had no substantial connection to NETS. Defendant also states that as further evidence of the separateness of his office, he had a "sign" of a car on his door signifying that the office was utilized to conduct RGS business. (Id., ¶¶ 8-9). Defendant then states that as the IRS agents were searching his office on August 19, 2005, he informed them that RGS occupied an office on the premises. (Id., ¶¶ 10-11).

Insofar as Defendant's representations in his affidavit concerning the separateness and exclusivity of this RGS office is concerned, there is substantial unimpeached evidence to the contrary. During his interviews, Defendant stated that Cruzastol moved his tax preparation business to 3107 Old McDuffie Road in 1999 and that he paid Defendant from $500 to $2,000 annually for rent.[15] (Doc. no. 23, Ex. C, ¶ 13). Further complicating

_____

improperly obtained from him. Thus, there is no evidence to refute SA Huebner's testimony on the voluntariness of Defendant's statements.

[15]The Court is puzzled by the fact that as of the August 19, 2005 search, Defendant controlled the NETS checking account, which according to Defendant was a joint account with RGS, and Defendant maintained that he was the only person with signature authority over the account. (Doc. no. 23, Ex. C, ¶¶ 13, 19).

Defendant's assertions of separateness is Defendant's explanation of his relationship with Beatrice Degro. During his August 19, 2005 interview, Defendant stated that Degro started up NETS in 2004, after Cruzastol "began phasing out his business." (Id., ¶ 17). Strangely, even though Degro "started up" NETS and claimed to be its owner, Defendant was the only person with signature authority over the NETS checking account, and he admitted paying Degro's salary of $540, less deductions, weekly. (Id., ¶¶ 18-19). In fact, a RGS/NETS checkbook was found in Defendant's office at 3107 Old McDuffie Road reflecting a salary check written to Degro. (SA Huebner Testimony, 2:18:22 - 2:19:01 and Hearing Ex. 9).[16]

Not only did Defendant admit paying Degro's salary, but he also admitted "overseeing the NETS operations" and "at times," collecting tax information from clients, putting the information in folders with the clients' names, and submitting them to Cruzastol or another employee who prepared the actual tax returns. (Doc. no. 23, Ex. C, ¶ 15). Defendant also admitted to assisting in the transfer of tax files from previous years from the office to the locked storage shed located next to the business. (Id.).

Insofar as his own workspace in the building was concerned, Defendant admitted that NETS kept "overnight checks" in a file cabinet in his office. It appears, however, that Defendant was much more involved in the day-to-day operations of NETS than he admitted. During the search of his office, agents seized from Defendant's desktop a folder containing an IRS Form 1040 United States individual income tax return. (Hearing Ex. 3). The agents

---

[16]Although a transcript of the July 1, 2008 hearing has not been prepared, the Court was able to review the testimony on the Court's recording System, For the Record ("FTR").

also seized a business envelope with the return address of Rabel General Service, J.R. Tax Services, 3109 Old McDuffie Road, Augusta, Georgia 30906.[17]

Defendant's office also contained folders labeled "Rabel General Services - IRS Info & News Letters" and "Updates & State Tax Offices," and in a separate packet, there was a folder labeled "Rabel Gen. Services Bank Deposits." (Hearing Ex. 5). Upon examination, the agents discovered that all these documents related to the tax preparation business and not the automotive repair business. (Id.; FTR 2:16:12 - 2:16:45). Still other documents relating to the tax business found in Defendant's office were located in folders labeled "Rabel Gen. Services Returns Transmitted to Slayer 2003 " in one folder, and in a second folder "Rabel Gen. Services Returns to Slayer 2003 continued."[18] (Hearing Ex. 6). SA Huebner described "TaxSlayer" as the software program NETS used to electronically transmit their clients' tax returns to the IRS. (Id.; FTR 2:16:53 - 2:17:12).

Further supporting the notion that Defendant was in fact the "overseer" of the NETS operation was the discovery in his office of a stack of documents labeled "New Era Tax Services Specialized Master Detail Reports; Type of Client Returns: All; Client Payment Status: Non Paid Clients; Preparer from 0-999 [all]; Receipt Date from 01/01/2005 to 08/12/2005." (Hearing Ex. 7; FTR 2:17:25 - 2:17:44). Clearly, documentation containing such sensitive client information on each NETS client, including the client's name, social

---

[17]The Court finds interesting that JRCTS at one time claimed the same mailing address as the RGS garage. (Hearing Ex. 4).

[18]During the undercover operation conducted at NETS on March 29, 2005, while Cruzastol was busy preparing fraudulent tax returns for the UCA, Degro was observed entering an unidentified name and social security number into a computer containing software titled "TaxSlayer." (Doc. no. 23, Ex. A, Huebner Aff., p. 13, ¶ 19).

security number, and telephone number is not meant for someone having no "substantial connection" to the NETS business affairs. It is clear that the volume of NETS documents, and the sensitive nature of those documents, in Defendant's office supports the conclusion that Defendant's affidavit in support of his motion to suppress is false in substantial part.

### 3.    Defendant's Credibility Problems

Credibility determinations in suppression hearings belong to the hearing judge, and are entitled to deference unless they reflect an "unbelievable" understanding of the facts. United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making a credibility determination, the Court must consider "the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." Ramirez-Chilel, 289 F.3d at 750.

Having heard the evidence, and examined the briefs and exhibits, the Court finds that each of the critical allegations in Defendant's brief and his affidavit are false. The record reflects, and the Court finds, that the IRS investigation culminating in the acquisition of a search warrant to search NETS revealed that over a period of years, Defendant was associated with and directly involved in a fraudulent scheme to prepare and file tax returns containing fraudulent misrepresentations. The Court further finds that Defendant concealed his direction, control, and ownership of the affairs at 3107 Old McDuffie Road in order to conceal the income generated by the combined businesses in operation there.

The credibility issues in this prosecution are stark. It is inescapable that every unimpeachable fact in this case points to the conclusion that Defendant is the true owner of

RGS and NETS. While exercising supervisory authority over Cruzastol and Degro, and while controlling their business accounts and paying their salaries, Defendant tells the IRS that Cruzastol and Degro paid him rent for using his property to operate his businesses.[19] Defendant's version of events presented in his motion to suppress simply is not credible.

## II.    DISCUSSION

### A.    No Reasonable Expectation of Privacy[20]

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Moreover, the Fourth Amendment "protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967). "The Amendment does not protect the merely subjective expectation of privacy, but only those expectation[s] that society is prepared to recognize as reasonable." Oliver v. United States, 466 U.S. 170, 177 (1984) (internal quotation marks and citations omitted). As the Supreme Court has clarified, the relevant inquiry involves a two-part analysis: first, "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and [second,] that his expectation is reasonable," that is, recognized and permitted by society. Minnesota v. Carter, 525 U.S. 83, 88 (1998). Stated otherwise, "[t]he inquiry is whether the [d]efendant's subjective expectation of privacy was legitimate or reasonable in light of the

[19]As Sir Walter Scott famously wrote in Marimon, "Oh what a tangled web we weave, when first we practice to deceive."

[20]The Fourth Amendment inquiry in this case is one of substantive law rather than one of "standing." See Rakas v. Illinois, 439 U.S. 128, 143-44 (1978).

existing circumstances." United States v. Scrushy, No. CR-03-BE-0530-S, 2005 WL 4149004, at *6 (N.D. Ala. Jan. 21, 2005). Defendant has the burden of establishing, under the totality of the circumstances, the contested search violated his legitimate expectation of privacy in a particular place. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980).

"The test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity. Rather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." Oliver, 466 U.S. at 182-83. In analyzing the degree to which a search may infringe upon individual privacy, this Court may weigh "the uses to which an individual has put a location." Id. at 178 (citing Jones v. United States, 362 U.S. 257, 265 (1960), *overruled on other grounds*, United States v. Salvucci, 448 U.S. 83, 85 (1980)). In conducting its analysis, the Court is mindful that the Eleventh Circuit "has recognized that ownership, or at least the right to exclude others, to control access to the place searched, is an important feature of a legitimate privacy expectation." United States v. Brown, 743 F.2d 1505, 1507 (11th Cir. 1984) (*per curiam*) (citations omitted). However, "even a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon." Rakas, 439 U.S. at 143 n.12.

Here, the Court concludes that Defendant has not met his burden. Defendant relies heavily on the argument that, because the building located at 3107 Old McDuffie Road contained offices for both RGS and NETS, the IRS agents violated his reasonable expectation of privacy by searching the entire premises. Defendant argues that because his

16

office was in fact an office for RGS, he had a legitimate expectation of privacy that society is prepared to recognize as reasonable. The Court disagrees.

Defendant maintains that his office had no substantial connection with NETS. However, on August 19, 2005, Defendant admitted that he supervised NETS, collected tax information from clients, stored some NETS checks as well as client files in his office, and maintained exclusive control over NETS's bank account, which according to Defendant was a joint account with RGS. Defendant also admitted paying Degro's salary, the purported "owner" of NETS. Defendant also had in his office numerous documents related to the tax preparation business, including "New Era Tax Services Specialized Master Detail Reports" and other sensitive information on NETS clients, including names, social security numbers, and telephone numbers. Notably, NETS documents were discovered in Defendant's office before Defendant arrived and announced the "separateness" of his office. Simply put, the evidence of Defendant's involvement with the operation of NETS at 3107 Old McDuffie Road is overwhelming.

Furthermore, although Defendant maintains that the door to his office remained locked and had a sign of a car on it representing it was utilized to conduct RGS business, SA Huebner testified that, on August 19, 2005, Defendant's office was unlocked and did not contain an RGS label. Indeed, although examination of the record confirms that there was a picture of a car on Defendant's office door (Hearing Ex. 2), nothing in the record, lends credence to the conclusion that Defendant's office was in fact a separate and distinct RGS

17

office.[21] Therefore, regardless of Defendant's property interest in RGS or his office located at 3107 Old McDuffie Road, he cannot now bootstrap himself into Fourth Amendment protections after (1) going to great pains to conceal his actual relationship to RGS and NETS prior to the August 19, 2005 search, (2) utilizing the unlocked office to conduct business for both entities, and (3) storing numerous documents in that office that qualified as items to be seized under the terms of the search warrant (either as NETS documents or as RGS documents related to the tax preparation activities at NETS).[22] Defendant may have subjectively believed that he could shield his activities by attempting to conceal his involvement with NETS and belatedly (and falsely) claiming his office was related only to RGS business, but that expectation was not reasonable in light of the circumstances. In sum, Defendant's contention that he had an objectively reasonable expectation of privacy in the office at 3107 Old McDuffie Road protected by the Fourth Amendment is completely unfounded and unsupported.

### B.    Scope of the Search

Assuming, *arguendo*, that Defendant established that he had a reasonable expectation of privacy in his office located at 3107 Old McDuffie Road, his argument for suppression,

---

[21]As discussed in detail above, Defendant's self-serving affidavit offered in support of a claim of "separateness" has been discredited in substantial part.

[22]Indeed, search warrants are not directed at persons, but rather authorize searches of places and seizures of things. United States v. Kahn, 415 U.S. 143, 155 n.15 (1974). Given the connection of Defendant's office to the objects sought by the warrant, Defendant's stake in the office is not determinative of whether agents were authorized to search therein. Stated otherwise, given what IRS agents knew about Defendant's relationship with Cruzastol and their business connections prior to the August 19, 2005 search, there was, as discussed in detail above, probable cause to believe that evidence of a crime would be found throughout the entire premises at 3107 Old McDuffie Road.

18

based on <u>United States v. King</u>, 227 F.3d 732 (6th Cir. 2000) and other similar cases, fails. According to Defendant, although the warrant was limited to NETS and its records and the IRS agents knew that entities or individuals other than NETS utilized the premises located at 3107 Old McDuffie Road, the IRS agents exceeded the scope of the warrant when searching the entire premises, including his office, and seizing RGS records without probable cause. (Doc. no. 23, pp. 9-12; doc. no. 31, pp. 4-6; doc. no. 35, pp. 2-6). The Government counters that <u>King</u>, and other similar cases cited by Defendant, are inapplicable in this case because he assisted in the preparation of income tax returns in his office, which contained income tax files. (<u>See</u> doc. no. 27, p. 3). Furthermore, the Government submits that, even if Defendant used his office solely for RGS business, the IRS agents were not aware of that at the time of the search. (Doc. no. 34, pp. 2-3). The Government has the better argument.

In <u>King</u>, law enforcement officers obtained a warrant to search a specific address that was "more fully described as the downstairs unit in a two-family, two and one half story, white wood[-]sided dwelling with green trim," for drug paraphernalia and weapons.[23] <u>King</u>, 227 F.3d at 737. As law enforcement officers executed the warrant and entered the downstairs unit, one of the defendants ran to the second floor before both defendants were subsequently secured in the downstairs unit. <u>Id.</u> at 738. Thereafter, the officers searched the downstairs unit, where cocaine base was found in both bedrooms. <u>Id.</u> Notably, one of the law enforcement officers also exited the downstairs unit and searched the building's basement, where cocaine base was also discovered. <u>Id.</u> Addressing the argument that the

---

[23]Notably, "[a] person [could not] directly access the basement from the downstairs unit. [The] [d]efendants . . . lived in the downstairs unit." <u>King</u>, 227 F.3d at 737-38.

scope of the warrant was impermissibly exceeded when the basement was searched, the Sixth

Circuit first explained,

> [B]ecause a valid search warrant can turn into an invalid general search if officers flagrantly disregard the limitations of the warrant, the issue . . . becomes whether the officer's search of the basement was a flagrant disregard for the limitations of the warrant. The test for making such a determination is whether the officer's actions were reasonable.

Id. at 751 (citations omitted). Concluding that the search of the basement exceeded the scope

of the warrant, the Sixth Circuit explained that the basement was not included within the

parameters of the warrant and that the nature of its location in the two-unit dwelling should

have provided notice that the warrant did not include the basement. Id. at 751-53. Although

the government argued that the scope of the warrant was not exceeded because the tenants

used the dwelling as a single unit, the Sixth Circuit found this argument unpersuasive

because law enforcement was not aware of its usage at the time of the search. Id. at 752.

Here, however, the search of Defendant's office was within the parameters of the

search warrant. Indeed, the warrant authorized the search of the "Offices and storage areas

of [NETS], formerly known as [JRCTS], 3107 Old McDuffie Road, Augusta Georgia, 30906

. . . ." (Doc. no. 23, Ex. A). As discussed, *supra*, Defendant admitted that he supervised

NETS, stored some NETS checks and client files in his office, maintained exclusive control

over NETS's bank account, and collected tax information from NETS clients. In this regard,

Harris, a former JRCTS client, also informed the IRS that Defendant prepared his 2002

income tax returns, which contained fraudulent expenses and charitable contributions.

Furthermore, because the building located at 3107 Old McDuffie Road contained no external

signs for any business and none of the offices within the building were marked, none of the

20

credible evidence suggests that the IRS agents should have been put on notice that the search warrant did not include the entire premises located at 3107 Old McDuffie Road.

Because the Court concludes that IRS agents should not have been on notice that Defendant's office at 3107 Old McDuffie Road was off limits under the terms of the search warrant, Defendant's reliance on <u>Maryland v. Garrison</u>, 480 U.S. 79 (1987), is inapposite. In <u>Garrison</u>, officers executed a warrant authorizing the search of "the premises known as 2036 Park Avenue third floor apartment," which was in fact divided into two apartments. <u>Id.</u> at 80. Before the officers became aware that they were in a separate apartment occupied by the defendant, they discovered contraband. <u>Id.</u> Addressing the question of whether the execution of the warrant violated the defendant's Fourth Amendment right to be secure in his home, the Supreme Court stated,

> If the officers had known, or should have known, that the third floor contained two apartments before they entered . . . , and thus had been aware of the error in the warrant, they would have been obligated to limit their search . . . . Moreover, as the officers recognized, they were required to discontinue the search of [the defendant's] apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included in the terms of the warrant. The officers' conduct and the limits of the search were based on the information available as the search proceeded.
> . . .

<u>Id.</u> at 86-87. Notably, the Supreme Court explained that, because the facts available to the officers at the time suggested no distinction between the two apartments, they properly responded to the command contained in the warrant, even if it were interpreted as authorizing a searched limited to one apartment. <u>Id.</u> at 88.

21

Likewise, here, the Court rejects the proposition that IRS agents should have known that Defendant's office was not subject to the warrant. Indeed, at the time of the search, items named in the warrant to be seized were found in Defendant's unlocked office that was not delineated as separate from NETS. Furthermore, unlike Garrison, the Court finds that the building located at 3107 Old McDuffie Road was not divided into separate and distinct offices utilized by separate and distinct businesses. Cf. id. ("In fact, the third floor was divided into two apartments . . . ."). Despite Defendant's contention, SA Huebner's schematic diagram merely demonstrates that Defendant, not RGS, occupied an office within the building located at 3107 Old McDuffie Road. (Doc. no. 23, Def.'s Aff., Ex. A). In this regard, Defendant acknowledges, *inter alia*, that "the building located at 3107 Old McDuffie Road contained **no external signs for any business**" and that "none of the offices within the building were marked." (Doc. no. 23, p. 3). Thus, Garrison does not support Defendant's argument for suppression.

Nor does the Court give credence to Defendant's argument that his office was used solely to conduct RGS business. As an initial matter, SA Huebner testified that, in August 2005, she believed that Defendant worked at NETS and merely operated RGS as a secondary source of income. Moreover, SA Huebner recounted that, even after Defendant belatedly challenged the search of his office, the IRS team-leader confirmed that Defendant's office lacked "identifiers" and that items within the scope of the warrant had been discovered in the office. As recounted in detail above, a RGS/NETS checkbook was found in Defendant's office, as were several folders labeled with RGS titles indicating that they contained business records related to RGS but which actually related to the tax preparation business. (Hearing

22

Exs. 5, 9). Moreover, Defendant's office yielded a NETS master detail report containing sensitive client information on tax payers who had utilized NETS to prepare their tax returns. (Hearing Ex. 7). Simply put, nothing in the record suggests that the IRS flagrantly disregarded the limitations of the search warrant, which was the situation contemplated in King, and other similar cases cited by Defendant.

In a case out of the Northern District of Georgia analogous to the one at bar, the defendant also moved to suppress evidence based on the argument that law enforcement officers exceeded the scope of a warrant by searching units of a multi-unit structure. United States v. Graham, 998 F. Supp. 1460, 1466 (N.D. Ga. 1997), aff'd, 182 F.3d 937 (11th Cir. 1999) (table).[24] In Graham, the defendant argued that law enforcement officers exceeded the scope of the warrant by searching units of the mall in addition to the unit identified in the warrant. Id. at 1466. Addressing that argument, the district court concluded that law enforcement's belief that the warrant authorized the search of the entire mall was reasonable under the circumstances for two reasons: (1) it was known that the defendant leased and controlled all of the units, and nothing inside suggested otherwise; and (2) it was believed

---

[24]In Graham, the defendant was the proprietor of two businesses which operated out of an otherwise vacant mall consisting of several retail units. Graham, 998 F. Supp. at 1461. After investigating allegations of theft involving one of the businesses, law enforcement officers obtained a warrant to search that "distinct" business. Id. at 1462-63. Although officers learned, prior to executing the warrant, that the defendant had leased the entire mall, nothing on the exterior of the other retail units indicated that they were used to conduct business other than the one which was the target of the search. Id. 1463. However, while inside the mall, officers discovered that one of the other retail units had been converted into an office containing, inter alia, supplies set up in a fashion commonly referred to as a telemarketing "boiler room." Id. at 1463-64. Thereafter, officers obtained a second warrant, describing the same location contained in the affidavit supporting the first warrant, and searched the "telemarketing office." Id. at 1464.

in good faith that the other units might be used to facilitate the criminal activity implicated in the warrant because all the units were in the same building as the target, and all the units were both vacant and easily accessible to the defendant. Id. at 1467-68. Furthermore, the district court noted that the warrant described "both a single business entity and the building in which the business was located, without distinguishing other units contained within the building" and that "nothing on the inside of the mall conveyed to the officers that the telemarketing office was not accessible to [the defendant] or otherwise under his control." Id. at 1467. Rejecting the defendant's argument for suppression, the district court concluded that, under those circumstances, law enforcement did not exceed the scope of the search warrant. Id. at 1467-68.

Similarly, here, the Court concludes that, under the totality of the circumstances, the August 19, 2005 search did not exceed the scope of the warrant. Assuming, *arguendo*, that the IRS agents knew prior August 19, 2005 that the premises located at 3107 Old McDuffie Road were utilized by multiple entities, the record, including SA Huebner's testimony, clearly demonstrates that the IRS believed that Defendant's office was utilized to facilitate the criminal activity implicated in the search warrant.[25] Although SA Huebner explained that

---

[25] As Defendant points out, the supporting affidavit stated, *inter alia*, that SA Huebner believed that Cruzastol and Defendant conspired to commit an offense against the United States, as well as willfully aided and assisted in the preparation of false or fraudulent income tax returns. (Doc. no. 23, Ex. A, Huebner Aff., p. 4, ¶ 4). Furthermore, the affidavit stated that SA Huebner knew that Defendant advised clients and prepared income tax returns at 3107 Old McDuffie Road while employed at NETS. (Id. at 5, ¶ 1). SA Huebner submitted that, based on the facts set forth in the affidavit, she believed that Defendant's computer hardware, software, related documentation, passwords, data security devices, and data were integral tools of the crimes implicated in the warrant. (Id. at 17, ¶ 4B). As such, SA Huebner requested authorization to seize, *inter alia*, Defendant's books, records, bank statements, canceled checks, deposit tickets, work-papers, financial statements, and other

she believed that Cruzastol was the President or CEO of RGS, that Defendant worked at NETS, and that Defendant merely operated RGS as a second source of income, Defendant's and Cruzastol's offices were both located within the building at 3107 Old McDuffie Road.

In this regard, SA Huebner testified that, on August 19, 2005, none of the interior offices at 3107 Old McDuffie Road were locked and nothing on Defendant's office door indicated that it was utilized to conduct business aside from NETS, and thus, it appeared accessible to Cruzasol, the target of the search warrant. Indeed, on August 19, 2005, Defendant informed the IRS agents that there was a file cabinet within his office where NETS kept overnight checks, which had no connection to RGS. (Doc. no. 23, pp. 3-4). Like Graham, the search warrant described both the NETS business entity and the location of the building in which it was located. (Id., Ex. A). Therefore, under the totality of the circumstances, the Court concludes that the August 19, 2005 search did not exceed the scope of the warrant.[26] See Garrison, 480 U.S. at 87 ("The officers' conduct and the limits of the search were based on the information available as the search proceeded."); see also United States v. Mousli, 511 F.3d 7, 12 (1st Cir. 2007) ("The police can validly search a multi-unit dwelling, even if the search warrant was only for a single-unit dwelling, provided the police

---

pertinent documents related to the preparation of income tax returns. (Id. at 20, Items To Be Seized). In this regard, as recounted in detail above, the IRS agents found income tax documentation, various files and folders, as well as an income tax return check for a client of NETS, in Defendant's office. (Hearing Exs. 3, 5-8, 10-11).

[26]To the extent Defendant complains that the Government seized documents clearly delineated as relating only to RGS, as noted above, SA Huebner though Cruzastol was the President or CEO of RGS. Moreover, the warrant allowed seizure of business records of clients of NETS, and RGS was a client of NETS. In any event, SA Huebner testified that no documents seized on August 19, 2005 have been utilized in the investigation of this case.

reasonably believed that the dwelling contained only one unit."). Therefore, the Court finds no basis for recommending suppression in this case.[27]

**D.    Search and Seizure of Computers**

Defendant also argues that the seizure and search of computers on August 19, 2005 was unconstitutional because neither the warrant nor the supporting affidavit contained a protocol outlining the methods that would be employed to ensure that the searches would relate to the allegations of probable cause. (Doc. no. 23, pp. 13-15; doc. no. 31, pp. 7-8). The Government counters that the lack of a search protocol does not render the warrant deficient in this regard. (Doc. no. 27, pp. 3-4; doc. no. 34, p. 4). Furthermore, the Government maintains that because the affidavit in support of the warrant meets the standards described in United States v. Lentz, CR 406-376, 2007 WL 2177071 (S.D. Ga. July 25, 2007), evidence obtained from the computers should not be suppressed. (Doc. no. 27, p. 4).

Indeed, the Government correctly points out that in Lentz, an analogous case out of this District, the defendant filed a motion to suppress, arguing, *inter alia*, that the search warrant failed to include "a protocol of any kind outlining the methods the government planned to employ, if any, to ensure that the searches conducted . . . would be related to the allegations of probable cause . . . ." Lentz, 2007 WL 2177071, at *4. Addressing this argument, the district court explained that the lack of a detailed computer "search strategy"

_____

[27]As Defendant failed to show that the scope of the warrant was exceeded and has not established that SA Huebner misled the Court in her application for the search warrant, the Court need not address Defendant's argument concerning the good faith exception to the exclusionary rule set forth in United States v. Leon, 468 U.S. 897 (1984).

does not render the warrant deficient as to the search and seizure of computers in the Eleventh Circuit. Id. (quoting United States v. Maali, 346 F. Supp. 2d 1226, 1245 (M.D. Fla. Aug. 8, 2004)). Noting that the supporting affidavit explained the need to search the computers based on the belief that they may contain evidence of the alleged crime, the district court found no reason to suppress evidence obtained from the search of the defendant's computers due to the lack of a search protocol. Id.

Similarly, the Court concludes the failure to include a search protocol in the warrant or supporting affidavit is not fatal to the search of Defendant's computers because SA Huebner explained the need to search the computers and described several techniques that may be utilized. (Doc. no. 23, Ex. A, pp. 17-18). In addition to complaining that the search warrant and supporting affidavit lacked a search protocol, Defendant submits, "SA Huebner fails to allege any probable cause to believe that [his] computer contained evidence of a crime." (Doc. no. 23, p. 14). However, as previously noted, SA Huebner stated, *inter alia*, that she believed that Defendant aided and assisted in the preparation of false or fraudulent income tax returns while employed at NETS, Defendant's computer was an instrumentality, fruit, or evidence of the subject crime, and Defendant's storage devices contained information about the subject crime. (Doc. no. 23, Ex. A, Huebner Aff., pp. 4-6, 17). Furthermore, nothing in the record suggests that any documents or information obtained from Defendant's computers will be used in the above-captioned case. Indeed, as previously noted, SA Huebner testified that none of the documents seized on August 19, 2005 were relied upon or utilized in the investigation concerning the above-captioned case.

27

In sum, Defendant has not established that the search of the computers was unreasonable.[28] Therefore, the Court finds no basis for recommending suppression based on the lack of a search protocol in the warrant or supporting affidavit.

## E. Defendant's Statements to Law Enforcement[29]

Finally, Defendant argues that, because his statements to IRS agents are "tainted" by the illegal August 19, 2005 search, the statements should be suppressed. (Doc. no. 23, pp. 15-18; doc. no. 31, p. 8; doc. no. 35, pp. 7-8). Defendant also contends that the Court should suppress his statements because, if the IRS agents had not deceived him concerning his status as a target of a criminal investigation, he would not have waived his right against self-incrimination and right to counsel on August 19, 2005. (Doc. no. 23, pp. 19-21; doc. no. 31, pp. 8-11; doc. no. 35, pp. 6-7). The Government counters that the August 19, 2005 search was constitutional, none of the evidence seized during the search was used for subsequent interviews with Defendant, the IRS's records are "sufficiently distinguishable to be purged of [any] primary taint," and he was not misled. (Doc. no. 27, pp. 4-7; doc. no. 34, pp. 4-5).

---

[28]Defendant correctly notes (doc. no. 31, pp. 7-8) that the Eleventh Circuit has been presented with the this same argument. United States v. Khanani, 502 F.3d 1281, 1290 (11th Cir. 2007). Although noting that the computer examiners utilized a "culling process" to "winnow[] down the files seized," the Eleventh Circuit rejected the defendants' argument because they "fail[ed] to cite any binding case law that would lead [it] to conclude that the procedures used . . . infringed defendants' Fourth Amendment rights." Id. at 1290-91. Despite Defendant's suggestion that the Fourth Amendment required the IRS to follow similar procedures, nothing in that decision supports this contention.

[29]The Court again emphasizes that SA Huebner testified that none of the documents seized on August 19, 2005 were relied upon or utilized in the investigation concerning the above-captioned case. As such, it appears that suppression of evidence seized as a result of the August 19, 2005 search is a moot issue in this case. However, as discussed, infra, Defendant challenges the August 19, 2005 search and seizure as a means of suppressing his statements made to IRS agents.

28

As the Court has concluded that the August 19, 2005 search was constitutionally permissible, it follows that Defendant's subsequent statements to IRS agents are not automatically "fruits of the poisonous tree" that must be suppressed. See Wong Son v. United States, 371 U.S. 471, 485-86 (1963) (explaining that evidence, including statements, discovered as a result of an earlier Fourth Amendment violation are tainted, and thus, cannot constitute proof against the victim of the violation)

Turning next to Defendant's argument concerning the waiver of his right against self-incrimination and right to counsel, the record does not support the conclusion that the IRS agents misled or deceived Defendant concerning its criminal investigation. Indeed, SA Huebner testified that, prior to August 19, 2005, Defendant had not been designated as the target of a criminal investigation in accordance with IRS procedure. Furthermore, SA Huebner testified that, prior to executing the warrant on August 19, 2005, the IRS interview-teams were instructed that Cruzastol was the only target of the IRS's criminal investigation and that Defendant was advised of his non-custodial rights as a precautionary measure. In this regard, SA Huebner testified that, although other individuals employed at NETS may have assisted Cruzastol in the preparation of false income tax returns, their potential culpability could not be determined until they were interviewed. Clearly, the IRS did not consider Defendant the target of any criminal investigation on August 19, 2005.

Moreover, Defendant has pointed to nothing in the record that supports his conclusion that IRS agents deceived him about the status of their investigation. First, it should be noted that, although Defendant submitted an affidavit (doc. no. 23, Ex. B) in support of his motion to suppress, nothing in that affidavit mentions being misled into

29

making statements, let alone supports his assertion in his briefing about being misled. Defendant correctly notes (doc. no. 23, p. 20; doc. no. 35, p. 6) that SA Huebner's supporting affidavit stated, *inter alia,* that he conspired to commit a criminal offense and prepared fraudulent income tax returns, but these assertions also supported the allegation that Cruzastol committed the offenses under investigation. (See doc. no. 23, Ex. A, pp. 4, 6-8). Furthermore, the record does not suggest that, on August 19, 2005, IRS agents misrepresented the nature of their investigation or deceived Defendant in any way. (Id., Ex. C). Rather, the record clearly demonstrates that, on November 3, 2005, "[SA Huebner] advised [Defendant] that he was *now* under criminal investigation" and that "[SA Huebner] *reminded* [Defendant] that *he was not* under criminal investigation during his previous interview . . . ." (Id. Ex. E, p. 1 (emphasis added)).

Simply put, the record clearly demonstrates that Defendant was not the subject of an IRS criminal investigation on August 19, 2005 and that he was not misled concerning the nature of the IRS's criminal investigation at that time. Defendant has not identified any evidence, affidavit or otherwise, supporting his belief that IRS agents misled him concerning the nature of their investigation. In the absence of any factual support for his claim that the IRS agents deceived him concerning the nature of their criminal investigation, and because Defendant's statements to IRS agents are not the "fruit of the poisonous tree," the Court finds no reason to recommend suppressing the statements or preventing the government from using them in its case in chief.

30

## III.    CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that the motions to suppress evidence be **DENIED**.  (Doc. nos. 22 & 23).

SO REPORTED and RECOMMENDED this _16th_ day of September, 2008, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE